UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

DESHAWN RAY MILTON,

                  Petitioner,                      Case No. 1:15-cv-143

v.                                                  Honorable Janet T. Neff

CARMEN PALMER,

                  Respondent.
_____/

## REPORT AND RECOMMENDATION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner DeShawn Milton presently is incarcerated at the Carson City Correctional Facility (DRF) in Montcalm County, Michigan.  Following a jury trial in the Ingham County Circuit Court,  Petitioner was convicted on single counts of second-degree murder, MICH. COMP. LAWS § 750.317, carrying a concealed weapon, MICH. COMP. LAWS § 750.227, and felony-firearm, MICH. COMP. LAWS § 750.227b.  On July 6, 2010, the trial court sentenced Petitioner to 25 to 40 years of imprisonment for the murder conviction, 2 to 7 years for the concealed-weapon conviction, and 2 years for the felony-firearm conviction. In his amended petition, Petitioner raises three grounds for relief, as follows:

      I.      Ineffective assistance of trial counsel where the shooting was an accident. Defendant was pistol whipping the deceased when the gun went off.  Trial counsel alluded to the defense of accident in opening and closing argument but never presented any supporting evidence.  Additionally although multiple eyewitnesses identified Petitioner, trial counsel put on an incompetent defense of misidentification.  Furthermore, trial counsel did not investigate from Petitioner himself what had happened, and advised him not to testify because the case "was in the bag."

II.    Trial court's refusal to give an instruction on statutory involuntary manslaughter violated Petitioner's right to present a complete defense and violated the due process right to have the jury properly instructed where evidence supported giving this instruction. There was a plenitude of evidence that the shooting was accidental, and occurred during the course of a pistol whipping.  However, the trial court said there was "no evidence" to support the theory of accident and refused to give the requested instruction.

III.    Ineffective assistance of appellate counsel where appellate counsel raised only one weak issue on the failure to give an instruction on involuntary manslaughter, and neglected to raise the issue of failure to give the instruction on accident, failed to raise the Due Process issue concerning Petitioner's right to have the jury instructed in accordance with the evidence, and failed to raise the issue of trial counsel's ineffectiveness as claim in Ground One.

(Am. Pet. 6-9, ECF No. 1, PageID.1023-1026).  Respondent has filed an answer to the petition (ECF No. 8) stating that Petitioner's claims are procedurally defaulted, noncognizable, or are without merit.  Upon review and applying the AEDPA standards, I find that Petitioner's grounds for habeas relief are without merit. Accordingly, I recommend that the petition be denied.

**Procedural History**

**A.    Trial Court Proceedings**

Petitioner's charges stem from the October 25, 2009, killing of Demarkis Rembert in Lansing, Michigan.  Petitioner received a preliminary examination in district court on December 4, 2009.  At the hearing, witness testimony described that Demarkis was returning to his home with some friends after taking a walk through the neighborhood.  At around 5:00 p.m., Demarkis and his friends were at the northwest corner of the intersection at West Barnes and South Washington avenues.  A vehicle then pulled into a parking lot at the intersection's southwest corner.  Witnesses stated Petitioner got out of the car and asked the group who had thrown a rock at his girlfriend's car. When Demarkis admitted throwing the rock, Petitioner and another individual crossed the street.

- 2 -

As they did so, Petitioner removed a .44 caliber revolver from his coat pocket.  Petitioner walked up to Demarkis and pistol whipped him, causing Demarkis to fall to the ground.  Around the same time, the revolver fired a shot that hit Demarkis.  Petitioner and his companion returned to their car and turned west on West Barnes avenue.  Thereafter, shots were exchanged between the occupants of the car and one of the individuals who was with Demarkis.  After the car left, Demarkis was lying on the ground and unresponsive.  Police and emergency responders arrived and took Demarkis to the hospital where he was pronounced dead a short time later at 5:40 p.m.  After hearing this testimony, the district court found probable cause to bind Petitioner over to stand trial on the charges in circuit court.  (Prelim. Examination H'rg 101, ECF No. 6-2, PageID.255).  Petitioner was tried before a jury beginning May  17, 2010, and concluding on May 28, 2010.[1]

Jury selection in this case took the entirety of the first day of trial.  On the second day,  the prosecution began their case-in-chief by calling Officer Catrina Cook to the witness stand.  Officer Cook testified that she was dispatched to the intersection of West Barnes and South Washington to respond to a report of a shooting.  (Trial Tr. II, ECF No. 6-4, PageID.315).  The officer testified that she was familiar with the area and there were both businesses and residences near the intersection.  At the northwest corner of the intersection there was a pool hall called Pockets

---

[1] The trial transcripts will be referenced as follows:

| Trial Transcript of May 17, 2010 | (Trial Tr. I, ECF No. 6-3, PageID.___). |
| Trial Transcript of May 18, 2010 | (Trial Tr. II, ECF No. 6-4, PageID.___). |
| Trial Transcript of May 20, 2010 | (Trial Tr. III, ECF No. 6-5, PageID.___). |
| Trial Transcript of May 21, 2010 | (Trial Tr. IV, ECF No. 6-6, PageID.___). |
| Trial Transcript of May 24, 2010 | (Trial Tr. V, ECF No. 6-7, PageID.___). |
| Trial Transcript of May 25, 2010 | (Trial Tr. VI, ECF No. 6-8, PageID.___). |
| Trial Transcript of May 27, 2010 | (Trial Tr. VII, ECF No. 6-9, PageID.___). |
| Trial Transcript of May 28, 2010 | (Trial Tr. VIII, ECF No. 6-10, PageID.___). |

and across the street on the southwest corner there was a store called Speedwagon.  (*Id.* at PageID.316).

When the officer arrived at the intersection, she observed "total chaos."  (*Id.* at PageID.317).  She parked on West Barnes with the vehicle facing to the west.  The vehicle was equipped with video recording equipment and was recording when the officer arrived.  (*Id.* at PageID.321).  There was an African American male lying on the ground near Pockets pool hall and he was surrounded by a large group of nearly one hundred individuals.  Some of them were crying and screaming.  There were two or three others who were trying to administer CPR.  (*Id.*)  The officer  approached the victim and saw him lying on his back.  He was not responsive and did not appear to be breathing.  Officer Cook contacted dispatch and requested assistance to handle the gathering crowd.  After a couple of minutes, paramedic units arrived and after a few more minutes, the paramedics took the individual away.  (*Id.* at PageID.317-318).

Officer Cook then interviewed several witnesses, including the victim's grandfather, Robert Rembert, who had witnessed the shooting.  Mr. Rembert was able to give the officer partial information regarding a license plate from the car that had parked at Speedwagon.  She relayed that information to dispatch and to other officers in the area.  (*Id.* at PageID.318-320).  Thereafter, the officer searched the area of West Barnes for spent cartridge casings and other evidence of a shooting, but was unable to find any such evidence.  (*Id.* at PageID.320).

Officer Stephanie Bakovoy testified that she was dispatched to the scene of the shooting at approximately 5:00 p.m.  (Trial Tr. II, ECF No. 6-4, PageID.324).  When she arrived, there were a few other officers already on the scene, including Officer Cook.  The Lansing Fire Department had also arrived.  They were working on a male subject and were preparing to place him

- 4 -

in an ambulance.  (*Id.*)  Officer Bakovoy went to join up with Officer Mandy Brunner, a half a block

away, who had received a report that someone had placed a gun in a wooden box behind a house in

the area.  (*Id.* at PageID.325).  They put up crime scene tape and took pictures of the area.  (*Id.*)

When she looked into the box, Officer Bakovoy was able to see a gun.  (*Id.* at PageID.326).  The

officer interviewed Claudia Kisor, who had told Officer Brunner about the gun.  Ms. Kisor told

Officer Bakovoy she saw a person put a gun inside the box and also believed that one of the bullets

may have ricocheted off of her house, though Officer Bakovoy was unable to find evidence of the

bullet.  (*Id.* at PageID.327-328).  Thereafter an individual at the scene began taking down the crime

scene tape that had been put up.  He was arrested and Officer Bakovoy took him to the Lansing City

Jail.  Afterwards, she worked with Officer Andrew Norton to process Demarkis Rembert's clothing

and place it into evidence.  (*Id.* at PageID.328).

      The next day, at around 8:45 p.m., Officer Bakovoy was directed by a detective to

stop a dark gray Grand Am that was seen driving on West Barnes.  (*Id.* at PageID.329)  The officer

was informed there was a witness to the shooting, Quen-Darious Johnson, in the vehicle.   Officer

Bakovoy stopped the car with Officer Thelen.  Quen-Darious was in the front passenger seat and he

was taken to the police department to be interviewed.  (*Id.* at PageID.330).

      Officer Mandy Brunner testified that she arrived at the scene of the shooting within

thirty seconds of receiving the dispatch alert.  (Trial Tr. II, ECF No. 6-4, PageID.332).  When she

arrived, Officer Cook was attending to the victim.  (*Id.* at PageID.332-333).  There was a large

crowd of people around Officer Cook, and Officer Brunner walked up to assist in crowd control.

While she was doing so, she was approached by Ms. Mickie Hollinshead who told her there was a

gun in the back alley.  Officer Brunner followed Ms. Hollinshead to the alley which was just west

of Pockets and saw a wooden box.  When she walked up to it she could see a handle of a gun sticking out from underneath.  (*Id.* at PageID.333).  Officer Brunner advised dispatch that she had found a gun and asked Officer Bakovoy to relieve her.  (*Id.*)

Officer Angela Matthews testified that she was one of the last officers to arrive at the scene of the shooting.  (Trial Tr. III, ECF No. 6-4, PageID.335).  When she arrived she helped put up crime scene tape.  (*Id.*)  She also interviewed witnesses who were inside Pockets pool hall and then searched the pool hall's parking lot.  (*Id.* at PageID.336).

Officer Dale Hamilton testified that he was dispatched to the scene of the shooting a little after 5:00 p.m.  (Trial Tr. II, ECF No. 6-4, PageID.338).  Dispatch relayed information that a silver Pontiac was involved in the incident.  (*Id.*)  He was en route to the scene when he saw a silver Pontiac driving south on Martin Luther King Jr. Boulevard.  The vehicle appeared to be driving at a higher rate of speed as compared to the rest of the traffic.  (*Id.*)  This raised the officer's suspicions, so he turned around and was able to stop the Pontiac.  (*Id.*)  He soon received updated information from dispatch about the suspect vehicle, however, and was able to determine that the car he had stopped, and those inside it, were not involved in the shooting.  He released the car and drove to the area of West Barnes and South Washington.  (*Id.* at PageID.339).  He assisted in securing the area and took some witness statements.  (*Id.*)

Officer Jeremiah Krimm testified that by the time he arrived at West Barnes and South Washington, there were already four or five officers there and the victim had already been taken away from the area.  (Trial Tr. II, ECF No. 6-4, PageID.341).  He assisted in providing perimeter security and also participated in a neighborhood canvas to speak with neighbors and

identify possible witnesses.  (*Id.*)  He was able to speak with some individuals who had relevant information and included those facts in his police report.  (*Id.*)

Officer Andrew Norton testified that when he arrived, firefighters were on scene and performing CPR on the victim in the parking lot of Pockets pool hall.  (Trial Tr. II, ECF No. 6-4, PageID.342-343).  The paramedics loaded Demarkis into an ambulance and the officer followed them to the Sparrow Hospital ER.  (*Id.* at PageID.343).  As hospital personnel worked on Demarkis, they located a bullet slug of an unknown caliber between the victim's shirt and body.  They placed the bullet in a plastic bag and the officer took a photo of it.  (*Id.* at PageID.344).  The officer stayed on scene and was there when Demarkis Rembert was pronounced dead at 5:40 p.m.  (*Id.* at PageID.343)  At that point, the body became evidence, and the officer stayed with it until it was taken to the morgue.  (*Id.* at PageID.343-344).  The officer took pictures of Demarkis's wounds, including an injury to the victim's back, chest, and a bruise to the left eye area.  (*Id.* at PageID.345).  The officer also obtained the victim's clothing and personal items.  (*Id.* at PageID.346).

Tiffany Paseka testified that she was a firefighter and paramedic for the city of Lansing.  (Trial Tr. II, ECF No. 6-4, PageID.348).  When she arrived there were already firefighter personnel working on Demarkis.  (*Id.* at PageID.349).  She assisted in placing Demarkis onto the ambulance's cot and continued resuscitation efforts.  She cut his clothes off and found a wound to his chest and back.  Electronic monitors showed that he had no pulse.  They applied dressings and then left for the ER.  (*Id.* at PageID.350).

Dr. Benjamin Mosher treated Demarkis at the Sparrow Hospital's emergency department and also testified as an expert in the field of surgery and trauma surgery.  (Trial Tr. III, ECF No. 6-5, PageID.353-354).  When the victim arrived, the paramedics were performing chest

- 7 -

compressions and bagging him with a bulb valve mask.  (*Id.* at PageID.354).  Demarkis was unresponsive and his pupils were dilated, and the doctor noticed a wound to the victim's chest.  (*Id.*) Resuscitative measures were not successful and Demarkis was pronounced dead at 5:40 p.m. (*Id.* at PageID.355).

Dr. Michelle Elieff testified as an expert in forensic pathology.  (Trial Tr. III, ECF No. 6-5, PageID.358).  Dr. Elieff performed an autopsy on Demarkis on October 26, 2009.  (*Id.*) The doctor observed a blunt force injury to the victim's left eye, an incision on the left chest, and a defect on the back, near the right shoulder area.  (*Id.* at PageID.359).  She identified the wound on Plaintiff's back shoulder as a gunshot entrance wound.  (*Id.* at PageID.360).  There was soot and a hole in the decedent's clothing as well.  (*Id.* at PageID.360-361).  She testified that the presence of the soot on the clothing, as well as on Demarkis's skin surrounding the gunshot wound, was consistent with a close-range gunshot wound, that is, a wound where the gun was only a few inches away from Demarkis when it had been fired.  (*Id.* at PageID.361).  Dr. Elieff testified that the bullet entered Demarkis's back shoulder and exited out the front of the left chest.  (*Id.* at PageID.362). After conducting her external evaluation, the doctor performed an internal evaluation and traced the wound path through Demarkis's body.  She testified that the wound went from the back to front, right to left, and slightly downward through the body.  (*Id.* at PageID.363-364).  The gunshot caused injuries to Demarkis's ribs, heart, and lungs.  (*Id.* at PageID.364).

Christopher Thomas testified that he was at his home on West Barnes Avenue on the night of the shooting when he heard three or four gunshots from two different guns. (Trial Tr. III, ECF No. 605, PageID.368).  He then saw a car make its way down West Barnes on the wrong side of the road.  It was being driven by a white female, with an African American male in the front

passenger seat and another individual in the back of the car.  (*Id.* at PageID.369).  Mr. Thomas called

911 and was later interviewed by Officer Cook.  (*Id.* at PageID.370).

        Nathan Stone testified that on October 25, 2009, he was at Pockets prior to beginning

his shift at the pool hall. (Trial Tr. III, ECF No. 6-5, PageID.371-372).  He was sitting at a table near

the glass door entrance when he heard three bangs coming from just outside the pool hall.  (*Id.* at

PageID.372).  He got up to look out the door and heard more bangs off to the right.  (*Id.*)  Mr. Stone

testified that he saw a white Pontiac with tinted windows on West Barnes.  (*Id.* at PageID.373-374).

It began to slowly move and then speed up.  He also observed some individuals standing just outside

of Pockets.  One individual was on the ground.  (*Id.* at PageID.374).  He saw another individual

shooting towards the car.  (*Id.*)  After the shooting stopped, Mr. Stone called 911.  (*Id.* at

PageID.375).

        John Spinner testified that he was cleaning brush out of his backyard with his wife

on Isbell street and they were preparing to go to Speedwagon to get a drink when he heard three

gunshots. (Trial Tr. III, ECF No. 6-5, PageID.380). He testified that one shot sounded different than

the others.  (*Id.*)  Not knowing the shooting had occurred at that intersection, Mr. Spinner drove with

his wife to Speedwagon.  When they arrived, about twenty minutes after hearing the shots, there was

no one at the store but a store employee and a couple of cops.  (*Id.* at PageID.380-381).  Mr. Spinner

spoke to a police officer, reported hearing the shots, and then purchased his drinks and left to go

home.  (*Id.* at PageID.381).

        Maria Spinner testified she was in her backyard on Isbell street getting ready to go

to the store when she heard what she thought were fireworks, but was told by her husband that they

were not fireworks.  She heard a few shots, and then after a pause, a few more.  (Trial Tr. III, ECF

No. 6-5, PageID.382).  They proceeded to the store and when they pulled into Speedwagon she noticed police officers at the scene.  (*Id.* at PageID.382).

Jeno Garcia testified that Demarkis Rembert was his cousin and they would see each other almost every weekend.  (Trial Tr. III, ECF No. 6-5, PageID.383).  At the time of his death, Demarkis had been living at his grandmother's house on Barnes Avenue, which was two houses down from Pockets pool hall on the same side of the street.  (*Id.* at PageID.384).  On October 25, 2009, Jeno went to Demarkis's house at around 10:00 in the morning where they were joined by their friend Carvante.  (*Id.* at PageID.385). Later in the day they joined up with some additional friends, Quen-Darious, Joc, and Del'Quece.  At around 3:00 that afternoon, they left and went to another friend's house on Herbert Street.  (*Id.*)  They did not stay there long, and soon left to go back to Demarkis's home.  (*Id.* at PageID.387).  At around 5:00 p.m. the group was outside Pockets when Jeno saw a silver Pontiac traveling north on South Washington and watched it pull into Speedwagon's parking lot.  (*Id.* at PageID.388).  Jeno recognized the car as one he had seen earlier that day.  (*Id.* at PageID.389).

Two men got out from the Pontiac.  (*Id.* at PageID.390).  The front seat passenger was wearing all black.  (*Id.*)  The backseat passenger was wearing a blue hoodie.  (*Id.*)  The front seat passenger asked the group who had thrown a rock at his girlfriend's car.  (*Id.* at PageID.391) Demarkis admitted he had been the one to throw the rock, and the individual wearing black made a comment about fighting.  Demarkis made a remark about doing so right there, and the man in black, along with the backseat passenger, approached Demarkis and his friends.  (*Id.*)  Jeno identified Petitioner as being the man dressed in black.  (*Id.* at PageID.392).

- 10 -

As he walked towards the group, Petitioner pulled a long, silver .44 caliber revolver out from his hoodie with his left hand.  (*Id.* at PageID.392-393).   Petitioner then walked up to Demarkis and swung his revolver at Demarkis's face.  (*Id.* at PageID.394).  Thereafter, Jeno saw Petitioner pull the trigger on the revolver.  (*Id.*)  Demarkis grabbed his face and then fell down to the ground.  (*Id.*)  Petitioner then ran back to the Pontiac and exchanged gunshots with Quen-Darious.  (*Id.*)  The car then left, heading west, on West Barnes.  (*Id.* at PageID.396).  Quen-Darious and Del'Quece also left the area, while Jeno stayed with Demarkis.  (*Id.* at PageID.396-397).  Later, Jeno was interviewed by Detective Lewandowsky.  (*Id.* at PageID.397).  He was shown photos of six individuals, and was able to identify the individual who had shot Demarkis.  (*Id.*)

Cheryl Kiogima testified that she was watching television in her house on West Barnes with her boyfriend and son when she heard a series of bangs.  (Trial Tr. IV, ECF No. 6-6, PageID.404).  Her boyfriend identified the bangs as gunshots.  (*Id.*)  She looked out her window onto West Barnes and saw a silver car coming down the wrong side of the road.  (*Id.* at PageID.405). She saw an arm hanging outside from the front passenger side window holding a gun.  (*Id.*)

Claudia Kisor testified that she was at her residence on Moores River Drive on the night of the shooting when she heard two gunshots.  (Trial Tr. IV, ECF No. 6-6, PageID.407).  She looked out her window and heard more gunfire.  (*Id.*)  She told her neighbor, Mickie Hollinshead, to duck, and heard something hit her bottom window.  (*Id.* at PageID.407-408).  Ms. Kisor then looked out from her kitchen window and saw a young man, whom she described as frantic, between her house and Ms. Hollinshead's residence.  She saw him with a gun and then saw him place it underneath a wooden box.  (*Id.* at PageID.408-409).  Ms. Hollinshead went to find a police officer, and they came and interviewed Ms. Kisor.  (*Id.* at PageID.410).

Christopher Eagle testified that he was working outside his home on West Barnes Avenue when he heard gunshots, which he thought came from two different guns.  (Trial Tr. IV, ECF No. 6-6, PageID.411).  He walked up his driveway and called 911, but did not get through. While he was still outside, a car drove down West Barnes on the wrong side of the road.  It was traveling at a very high rate of speed.  (*Id.*)  He described the car as a gray or silver Grand Am or Grand Prix.  (*Id.*)  That afternoon he was interviewed by Officer Krimm.  (*Id.* at PageID.411).

Gerrit Heuer testified that he was in the front garden area of his house on South Washington avenue when he heard multiple gunshots coming from the direction of Pockets pool hall.  (Trial Tr. IV, ECF No. 6-6, PageID.413).  He thought there were two weapons involved because of the differences in sound.  (*Id.*)  He told his wife to lock the door, and then observed three or four individuals running from the area.  (*Id.*)  He went up to the intersection and saw a young man on the ground between the sidewalk and the curb in front of the pool hall.  A crowd had also begun to gather. (*Id.* at PageID.414).

Carvante Bowers testified that he knew Demarkis Rembert from school.   (Trial Tr. IV, ECF No. 6-6, PageID.414).  They were pretty close friends and would hang out together on the weekends.  (*Id.*)  On October 25, 2009, he had spent the previous night at Demarkis's home on West Barnes Avenue.  (*Id.* at PageID.416).  They were joined by Quen-Darious, Del'Quece, Jeno, and Joc later in the day.

The group decided to go for a walk in the neighborhood and were near the pool hall when a car with two males and one female drove up in front of Speedwagon.  (*Id.* at PageID.417). At the time, Carvante was on the phone with one of his friends.  (*Id.* at PageID.418).  Carvante described the car as silver and either a Pontiac Grand Am or a Malibu, but he wasn't sure.  (*Id.*)

Carvante testified that he had not seen the car before then.  (*Id.*)  Petitioner and another man got out of the car.  (*Id.* at PageID.419).  There was an initial conversation between Petitioner and Demarkis. Petitioner asked who threw a rock at his car.  Demarkis responded with a remark about fighting, and the front seat passenger stated "one of you dudes is going to take a bullet for it."  Petitioner then stepped into the street, pulled out a silver gun, and walked up to Demarkis.  (*Id.* at PageID.419-420). Carvante testified that Petitioner then pistol whipped Demarkis across his face.  (*Id.* at PageID.422). Thereafter Petitioner shot Demarkis, and Demarkis fell to the ground.  (*Id.* at PageID.423).  Carvante and Joc ran across South Washington Avenue.  (*Id.*)  While he was running, Carvante heard multiple gunshots.  (*Id.*)  After the shots stopped, he went back to check on Demarkis.  By then, the police were already there and Demarkis was unresponsive.  (*Id.* at PageID.424).

Quen-Darious Johnson testified that he was a close friend of Demarkis Rembert and they would see each other quite often.  (Trial Tr. IV, ECF No. 6-6, PageID.435).  At around 1:00 p.m. on October 25, 2009, Quen-Darious went to Demarkis's home on West Barnes Avenue with his cousin Del'Quece Thompson.  They were later joined by several other friends and at approximately 4:00 that afternoon, the group of Demarkis, Joc, Jeno, Carvante, Quen-Darious and Del'Quece left to go for a walk.  They were walking down Isbell street when Demarkis asked Quen-Darious whether he had seen some people that were looking at them.  (*Id.* at PageID.436).  Quen-Darious testified that Demarkis was referring to some individuals they had seen standing near a silver Pontiac Grand Prix.  (*Id.* at PageID.437).  Quen-Darious testified he had seen the same car about four or five months earlier.  At that time he was with Demarkis and another friend on the corner of Isbell and Cedar.  (*Id.*)  They were walking in the street when two vehicles, a silver Grand Prix and a black Grand Prix, turned onto the street.  Demarkis and his friends tried to get out of the

way, but the silver Grand Prix hit Demarkis.  (*Id.*)  Demarkis then grabbed a rock and threw it at the car.  (*Id.* at PageID.437-438).  The driver, a white woman with blonde hair, turned around, parked the car, and got out to confront the group.  (*Id.* at PageID.438).  Quen-Darious testified that she jumped out and acted crazy.  She called them names.  (*Id.*)  The black Grand Prix also parked, and its driver, who was Petitioner, got out.  He told the woman to calm down and told Demarkis and his friends it was all right.  Demarkis and Quen-Darious then walked away.  (*Id.*)  They had no further contact with Petitioner prior to the events of October 25, 2009.  (*Id.* at PageID.439).

Returning to the day of October 25, 2009, Quen-Darious testified that other than Demarkis's question, there was no further discussion about or interaction between the group and the silver Grand Prix, but on their way back to Demarkis's house, the group purposely avoided the house where they had seen the Grand Prix.  They were at the intersection of West Barnes and South Washington when Quen-Darious saw the Grand Prix driving up South Washington.  (*Id.* at PageID.440).  The car pulled into Speedwagon's parking lot and Petitioner got out and asked the group who had thrown a rock at his girlfriend's car.  (*Id.* at PageID.441). Quen-Darious recognized Petitioner as the man he had seen in the black Grand Prix a few months earlier.  (*Id.* at PageID.442).  Demarkis responded that he had thrown the rock, and Petitioner told Demarkis to come over to him.  Demarkis refused, and Petitioner began "pumping" himself up and walked over towards them.  (*Id.*)  Petitioner reached into his hoodie and asked Demarkis if one of his friends was going to take a bullet for him.  (*Id.*)  Petitioner got closer, and pulled out a silver .44 magnum revolver with a black handle.  (*Id.*)  Petitioner swung the revolver at Demarkis's head.  When Petitioner swung the revolver, Demarkis was ducking.  The gun went off while Petitioner was swinging the gun, and it looked like Demarkis had been shot in the head.  (*Id.* at PageID.443).  Petitioner turned around and

- 14 -

started to run.  Quen-Darious then asked for his gun, which his cousin Del'Quece had been carrying for him.  (*Id.* at PageID.444).  Quen-Darious fired a shot at Petitioner, who by then had run back to the silver Grand Prix.  (*Id.* at PageID.444-445).  The car drove out of the parking lot and turned onto the wrong side of the road.  (*Id.* at PageID.445). Quen-Darious saw Petitioner's arm out of the car's window, repeatedly letting shots off.  (*Id.*)

Quen-Darious then went to hide his gun in a wooden box in an alley.  (*Id.* at PageID.446).  Thus the gun identified by earlier witnesses was not the gun that Petitioner had used. After placing the gun under the box, Quen-Darious returned to Demarkis.  Quen-Darious took his shirt off to place it on Demarkis's wound.  (*Id.*)  The police arrived, and Quen-Darious stayed for a few minutes and then left.  He was later interviewed by the police.  (*Id.*)

Christina Thomas testified that she driving to her parents' house on West Barnes when she was flagged down at the intersection of East Barnes and South Washington.  (Trial Tr. V, ECF No. 6-7, PageID.456).  She observed people standing around a body.  One of those she saw was a young African American male wearing a gray sweatshirt and blue jeans.  She described him as distraught.  He was jumping up and down, screaming, and cussing.  (*Id.* at PageID.456-457).

Del'Quece Thompson testified that he knew Demarkis Rembert through his cousin, Quen-Darious.  (Trial Tr. V, ECF No. 6-7, PageID.458).  On October 25, 2009, Del'Quece and Quen-Darious met up with Demarkis around noon.  (*Id.* at PageID.458-459).  Carvante, Jeno, and Joc also joined them.  About forty minutes before the shooting, the group left Demarkis's house to walk around the neighborhood.  (*Id.* at PageID.459).   When they left, Del'Quece was carrying Quen-Darious's .44 magnum revolver.  (*Id.* at PageID.460).  As they walked down Isbell street, Del'Quece saw Petitioner and his girlfriend standing near a silver Grand Prix.  (*Id.* at PageID.460-

461). Petitioner was wearing a black shirt and dark pants.  (*Id.*)  Del'Quece testified that Petitioner and his girlfriend had been talking, but when Demarkis and his friends walked by them, Del'Quece noticed the two stopped talking and put their full attention onto the group.  (*Id.*)  At the time, Del'Quece, did not think anything of it and did not speak of it to any of his friends.  (*Id.*)  The group kept walking and ended up at a store.  When they left the store, they went back towards Demarkis's home via a different route.

When they were in the intersection at Barnes and South Washington, the silver Grand Prix pulled into the turn lane and acted like it was going to hit them.  (*Id.* at PageID.462-463).  The Grand Prix then turned into the Speedwagon parking lot and parked.  (*Id.* at PageID.464).  The group continued on, and were in front of Pockets pool hall when two men got out from the car.  (*Id.* at PageID.466).  Petitioner, who had been in the front passenger seat, asked the group who had thrown a rock at his girlfriend's car.  (*Id.*)  Demarkis then told Petitioner that he had thrown the rock.  (*Id.*)  At this point, the group was across the street from the car and its passengers, and Petitioner told Demarkis that when he caught him, he'd beat him.  Demarkis responded that they should "scrap" right then.  (*Id.* at PageID.467).  Petitioner then crossed the street, and when he was in the middle of the street, pulled out a gun from his jacket.  Petitioner then asked if any one of Demarkis's friends would take a bullet for him.  (*Id.*)  Then Petitioner walked up to Demarkis with his gun in his left hand, and swung it at Demarkis's head.  (*Id.*)  Demarkis tried to duck.  As he did so, Demarkis tripped and fell.  About two seconds after Petitioner hit Demarkis, the gun went off.  Petitioner was standing over Demarkis when this happened.  (*Id.* at PageID.468).  Del'Quece then gave Quen-Darious his gun, who started shooting back towards the silver Pontiac.  (*Id.*)

- 16 -

Ashley Bynum testified that Petitioner and her sister, Crystal Campbell, were in a dating relationship.  Petitioner was the father of her niece.  (Trial Tr. V, ECF No. 6-7, PageID.477).  Crystal owned a four door Pontiac Grand Prix.  (*Id.* at PageID.479).  On the afternoon of October 25, 2009, Crystal and Petitioner took their child to Ashley's house on Isbell street to carve pumpkins.  (*Id.*)  When they arrived, Ms. Bynum went out to greet them.  (*Id.* at PageID.480).  While they were speaking outside, a group of teenaged boys walked by her house.  (*Id.*)  Ms. Bynum remembered either her sister or Petitioner then said something about a stone or rock.  (*Id.*)  After a few minutes, Petitioner and Crystal left.  (*Id.* at PageID.481).  Around 7:30 that night Ashley drove to the area of West Barnes and South Washington.  She had not previously heard any gunshots or police sirens.  When she saw police cars in the area, she turned around because she had an illegal license plate.  (*Id.* at PageID.482).  That night, Ms. Bynum took her niece home to her parents.  When she saw her sister, her sister was acting normal.  (*Id.* at PageID.483).

Demarkis's grandfather, Robert Rembert, testified that his grandson had been living with him prior to his death.  (Trial Tr. V, ECF No. 6-7, PageID.486).  On October 25, 2009, Robert was at his house with two friends, Vincent Johnson and George Stewart.  (*Id.*)  They left the house to go get some beer at Speedwagon.  There they saw a white car in the parking lot that was still running.  Robert then heard a few gunshots.  (*Id.* at PageID.487).  He ran to his grandson, and as he did so, the car took off.  (*Id.*)  He was able to read some of the license plate's numbers.  (*Id.*)

Vincent Johnson testified that around 5:00 p.m. on October 25, 2009, he was sitting on the porch with Robert Rembert and their friend "Duck" at Robert's house when they left to go to Speedwagon.  (Trial Tr. V, ECF No. 6-7, PageID.488).  As they walked to the store, they saw Demarkis with a few other boys near the Pockets pool hall.  (*Id.* at PageID.489).  They also saw a

- 17 -

car in the Speedwagon parking lot.  Mr. Johnson then saw an individual holding a gun cross the street and walk over to Demarkis.  The individual hit Demarkis and, while he was standing over Demarkis, fired a shot at him.  (*Id.*)  The individual then went back to the car and left.  (*Id.* at PageID.490).

Officer Phil Nardone testified that he arrived at the scene around 5:45 p.m. on October 25, 2009.  (Trial Tr. V, ECF No. 6-7, PageID.494). Officer Bokovoy told him about the gun under the wooden box, and he collected the gun as evidence. (*Id.*)  The officer also noticed a pickup truck parked on West Barnes had a flat tire, and suspected the tire had been hit by a bullet.  (*Id.* at PageID.498-499).  He determined the vehicle was owned by George Stewart.  (Trial Tr. VI, ECF No. 6-8, PageID.505).  After testing, the officer confirmed that the tire had a hole in it consistent with being caused by a bullet.  (*Id.*)  A few months later, on January 20, 2010, the officer assisted in processing a silver 2004 Pontiac Grand Prix.  (*Id.* at PageID.508).  They took photographs and dusted for fingerprints both inside and outside the car.  (*Id.* at PageID.509).  On the front windshield there was a piece of cardboard taped to the windshield.  (*Id.*)  Underneath, there was a hole in the windshield.  (*Id.* at PageID.510).  Officer Nardone concluded that the damage was done by a bullet.  (*Id.*)

Sergeant Reinhard Pope testified that he examined a gun and ballistics evidence connected to the case.  (Trial Tr. VI, ECF No. 6-8, PageID.516).  He examined a .44 caliber six-shot revolver.  (*Id.*)  It was a single action revolver, so to fire it, one would have to cock the hammer, and then pull the trigger.  (*Id.* at PageID.518).  The sergeant also examined three live cartridges and two fired cartridges.  (*Id.*)  The live cartridges contained semi-jacketed soft point bullets.  (*Id.* at PageID.519).  The two fired cartridges did not have a bullet in them, but were of the same brand and

make as the three live cartridges.  (*Id.* at PageID.520).  The sergeant also examined a fired bullet.

While it was the same caliber and had similar rifling characteristics, it was different than the bullets

that were in the live cartridges because it was a solid lead bullet and did not have a copper jacket

like the bullets in the live cartridges.  (*Id.*)  After further testing, the sergeant was unable to identify

or eliminate the recovered bullet as having been fired from the Super Blackhawk gun.  (*Id.* at

PageID.522).

Gerald Olsen testified that Crystal Campbell purchased a silver 2004 Grand Prix

through his employer, R.P.M. Auto Sales, on January 24, 2009.  (Trial Tr. VI, ECF No. 6-8,

PageID.526-527).  Ms. Campbell financed her purchase and had made several payments on the car.

The last payment was received on October 19, 2009, though that payment did not satisfy the full

amount owed on the car.  (*Id.* at PageID.527).  When no further payments were made, the car was

repossessed on December 11, 2009. (*Id.* at PageID.529).  R.P.M. Auto Sales then gave police access

to the car.  (*Id.*)

Officer Quincy Scroggins testified that he had been off work on October 25 and 26.

When he returned to work on October 27, 2009, he was told that a homicide had taken place in the

area of Barnes and Washington and that there was a gray vehicle that had been involved in the

incident.  (Trial Tr. VI, ECF No. 6-8, PageID.530).  Based off information he was given, he went

to Ashley Campbell's residence on Isbell Street.[2]  He knew Ashley had a sister named Crystal, and

ran Crystal's information into the Secretary of State system.  His search indicated that there was a

2004 Pontiac Grand Prix registered in Crystal's name.  (*Id.* at PageID.531-532).  He placed Crystal's

---

[2] It appears Ashley Campbell is the same person as Ashley Bynum.

name into the police department's in house computer system and it returned Petitioner's name as one of Crystal's known associates.  (*Id.* at PageID.532).

Detective Sergeant Tom Fabus testified that he was informed of the shooting at around 5:30 in the afternoon on October 25, 2009.  He convened a meeting at the precinct office and reviewed the information they had so far, and then divided up the responsibilities for investigating the case.  (Trial Tr. VI, ECF No. 6-8, PageID.533).  He assigned Detective Mark Lewandowsky to the lead investigator role and Detective Andy Hogan to be the secondary investigator.  (*Id.*)  That night Detective Fabus went with his partner to the crime scene to meet with Officer Nardone.  (*Id.*)  The next day, the dashboard video from Officer Cook's patrol car was downloaded.  (*Id.* at PageID.534).  On October 27, 2009, Officer Scroggins provided a name of a possible suspect and Detective Fabus asked his administrative assistant to prepare a photo-line up to show potential witnesses.  (*Id.* at PageID.536).

George Stewart testified that he drove his truck to Robert Rembert's house on October 25, 2009.  (Trial Tr. VII, ECF No. 6-9, PageID.541).  He was there for about an hour and forty-five minutes when they left to go to the store to get some beer.  (*Id.*)  While he was walking to the store, he saw a group of about ten or twelve guys outside of Pockets and then saw a man cross the street and walk towards them.  (*Id.* at PageID.542).  There was a silver car in the store's parking lot.  (*Id.*)  The man was wearing a blue hoodie and had a gun in his right hand.  (*Id.* at PageID.543).  Mr. Stewart started to walk away and then heard a series of shots.  (*Id.*)  The car then took off down the street on the wrong side of the road.  (*Id.*)  He later talked to the police and told them that his truck had a flat tire.  (*Id.* at PageID.544).

- 20 -

Officer Terry Blount testified that he processed the silver 2004 Pontiac Grand Prix with Officer Nardone.  (Trial Tr. VII, ECF No. 6-9, PageID.545).  The two officers collected two latent fingerprints from the car.  (*Id.* at PageID.546).  Inside they also found some paperwork with Petitioner's name on it.  (*Id.* at PageID.547).

Officer Andrew Hogan testified that he was the "second chair" of the investigation into Demarkis Rembert's killing.  (Trial Tr. VII, ECF No. 6-9, PageID.548).  On October 27, 2009, the officer interviewed Carvante Bowers with Detective Lewandowsky.  (*Id.*)  He showed a photo line up of possible suspects to Carvante, one of whom was Petitioner.  After looking at the photographs for less than a minute, Carvante identified Petitioner's photograph as the individual he had seen shoot Demarkis, though he indicated he could not be positive.  (*Id.* at PageID.549-550).

Detective Mark Lewandowsky testified that after he was assigned to the case, he drove to the crime scene and met with Officer Nardone and Sergeant Bakos to do an initial walk-thru.  (Trial Tr. VII, ECF No. 6-9, PageID.550-551).  Thereafter, he returned to the precinct offices and began interviewing witnesses.  (*Id.*)  On October 26, the detective attended the autopsy of Demarkis Rembert.  (*Id.* at PageID.552).  During his investigation he learned that Quen-Darious Johnson may have had information regarding the case.  (*Id.* at PageID.553).  They were able to locate and interview Quen-Darious.  (*Id.* at PageID.553-554).  Quen-Darious mentioned an earlier incident near a house on Isbell street, and the detective drove with him to that house.  (*Id.* at PageID.555). Later, the detective interviewed Del'Quece Thompson and Carvante Bowers and re-interviewed Quen-Darious, and was able to obtain positive identifications of Petitioner from photographic lineups.  (*Id.* at PageID.556-558).

- 21 -

The prosecution then rested.  The defense did not call any witnesses.  After hearing jury instructions and closing arguments, the jury found Petitioner guilty of second-degree murder on count one, and guilty on counts two and three. (Trial Tr. VIII, ECF No. 6-10, PageID.603). Petitioner was sentenced on July 6, 2010, as an habitual offender–second offense, to  25 to 40 years of imprisonment for the murder conviction, 2 to 7 years for the concealed-weapon conviction, and 2 years for the felony-firearm conviction.   (Sentencing Hr'g, ECF No. 6-11, PageID.610).

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on March 16, 2011, raised a single issue:

> I.    THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY REGARDING THE LESSER OFFENSE OF STATUTORY INVOLUNTARY MANSLAUGHTER

(*See* Def.-Appellant's Br. on Appeal, ECF No. 6-16, PageID.690).  Petitioner did not file a  Standard 4 brief.  By unpublished opinion issued on November 1, 2011, the Michigan Court of Appeals rejected Petitioner's appellate argument.  (*See* 11/1/11 Mich. Ct. App. Op. (MCOA Op.), ECF No. 6-16, PageID.686-688).

Petitioner filed an application for leave to appeal to the Michigan Supreme Court raising the same claim raised before and rejected  by the Michigan Court of Appeals.  (*See* Def.-Appellant's Appl. for Leave to Appeal, ECF No. 6-17, PageID.733).  By order entered April 23, 2012, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that the question presented should be reviewed.  (*See* 4/23/2012 Mich. Ord., ECF 6-17, PageID.731).

### C.    Post-Conviction Relief

Petitioner returned to the trial court by filing a motion for relief from judgment asserting the three claims raised in the instant petition.  (*See* Mot. for Relief from J., ECF No. 6-12, PageID.612-616).  In an order issued on September 30, 2013, the trial court denied the motion. (9/30/13 Op. & Order, ECF No. 6-15, PageID.678-684).  Thereafter, Petitioner sought leave to appeal the trial court's decision to the Michigan Court of Appeals.  On June 3, 2014, the court of appeals denied Petitioner's delayed application for leave to appeal, citing MICH. CT. R. 6.508(D). (6/3/14 MCOA Op., ECF No. 6-18, PageID.750).  Petitioner sought leave to appeal that decision to the Michigan Supreme Court, but the court denied relief, citing MICH. CT. R. 6.508(D).  (2/3/2015 Mich. Ord., ECF 6-19, PageID.891).

Petitioner filed the instant action requesting habeas relief ten days later on February 13, 2015.  (ECF No. 1).  This case is ripe for decision.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the

Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods*, 2015 WL 1400852, at

- 24 -

*3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).   The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.

2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.    Ineffective Assistance of Trial Counsel

In his first ground for habeas relief, Petitioner contends that his trial counsel rendered ineffective assistance for failing to pursue a theory of accidental discharge at trial and instead claiming a theory of misidentification.  He further alleges his trial counsel was ineffective for failing to call him to the stand at trial to testify in his own defense because the case was "in the bag."  The undersigned concludes that Petitioner has not demonstrated he is entitled to relief.[3]

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions

---

[3] It may be argued that Petitioner has procedurally defaulted this claim.  As is well recognized, however, a district court may presume that the default has been excused and proceed to a review on the merits.

were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

A.      *Failure to Present an Accident Theory*

Petitioner argues that his trial attorney, although making brief references during opening and closing remarks, was ineffective in failing to pursue a theory of accident at trial.  His claim is wholly meritless.

At trial, Petitioner's counsel pursued the theory that Petitioner was not involved in the shooting of Demarkis Rembert in any way, that is, that this was a case of mistaken identity. Trial counsel clearly pursued that theory as a strategic matter.  Decisions as to whether to call certain

witnesses or what evidence to present are presumed to be a matter of trial strategy, and the failure to call witnesses or present evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir.2002). A defense is substantial if it might have made a difference in the outcome of the trial. *Matthews*, 319 F.3d at 790 (citing *Strickland*, 466 U.S. at 693–96). Petitioner failed to rebut the presumption that counsel's decision to argue misidentification was strategic.

Petitioner raised this claim for the first time in his motion for relief from judgment. The trial court determined that Petitioner could not succeed on this ineffective assistance claim:

> Regardless, Defendant is essentially claiming that trial counsel should have pursued an accidental shooting theory, rather than a misidentification theory. The Court is unpersuaded by this and the rest of Defendant's claims. "That the strategy [trial counsel] chose ultimately failed does not constitute ineffective assistance of counsel." *People v Kevorkian,* 248 Mich App 373, 414-15 (2001). Furthermore, a failure by counsel to raise frivolous or meritless issues does not constitute ineffective assistance. *Cf. People v Riley (After Remand),* 468 Mich 135, 142 (2003). Finally, actual prejudice has not been shown; Defendant did not have a reasonably likely chance of acquittal, and there was no offensive irregularity to the maintenance of a sound judicial process.

(9/30/13 Op. & Order, ECF No. 6-15, PageID.684).

The court's opinion is entirely consistent with *Strickland* and its progeny. Counsel's strategic decision to pursue a theory of mistaken identity rather than accident was eminently reasonable. At trial the prosecution witnesses gave inconsistent testimony regarding the shooter's hair length, the clothing worn by the shooter, and the hand used to discharge the gun. Quen-Darious Johnson testified that Petitioner had earlier tried to de-escalate the situation immediately after Demarkis had throw a rock at the silver Grand Prix, a fact somewhat at odds with Petitioner's later acts. (Trial Tr. IV, ECF No. 6-6, PageID.435). This defense, albeit unsuccessful, was clearly

stronger than Petitioner's theory of accident.  Several witnesses testified that they distinctly saw Petitioner swing the gun and, although close in time to the strike, fire the gun in a distinct event. Jeno Garcia saw the shooter pull the trigger.  (Trial Tr. III, ECF No. 6-5, PageID.394). Del'Quece Thompson saw the shooter shoot the gun two seconds after swinging the gun, and while Demarkis was laying on the ground.  (Trial Tr. V, ECF No. 6-7, PageID.468). Having pursued the theory of mistaken identity, counsel would have completely undermined his case by suggesting to the fact finder that Petitioner was in fact there, but did not intend to shoot Demarkis.  Furthermore, Petitioner has not indicated what questions his counsel should have asked or what testimony could have provided that would have aided an accident defense.

Based on this information, it is clear that Petitioner was not deprived of a substantial defense based on his attorney's decision not to pursue an accident defense.  *See Strickland*, 466 U.S. at 689 (noting the petitioner must overcome the strong presumption that his attorney's "challenged action [or inaction] might be considered sound trial strategy.").  Because Petitioner has not demonstrated deficient performance under *Strickland*, the Court need not touch on the second prong (prejudice). *See Campbell*, 364 F.3d at 730 (quoting *Strickland*, 466 U.S. at 697).

### B.    Failure to Call Petitioner to the Stand

Petitioner secondly argues that his counsel was ineffective for failing to investigate Petitioner's accident defense and call him to the stand.

It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365,

- 29 -

384 (1986) (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); accord *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

Here, Petitioner has not actually alleged that there were facts that his counsel was unaware of or did not understand. As Petitioner admits, his counsel actually mentioned a theory of mistake during his opening and closing arguments. Petitioner appears merely to disagree with his counsel's strategic decision but does not bolster this theory with additional facts. Instead, Petitioner's claim that counsel failed to investigate is reduced to a claim that it was not possible to argue this theory without putting Petitioner on the stand. Thus this claim and the next are really one and the same: his counsel should have permitted him to testify.

Petitioner is not entitled to relief. A criminal defendant has a constitutional right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). Defense counsel's role is to advise the defendant whether to testify, but the ultimate decision is for the defendant to make. *United States v. Hover*, 293 F.3d 930, 933 (6th Cir. 2002). When a tactical decision is made by an attorney that a defendant should not testify, the defendant's assent is presumed. *United States v.*

- 30 -

*Webber*, 208 F.3d 545, 551 (6th Cir. 2000).  A trial court has no duty to inquire *sua sponte* whether a defendant knowingly, voluntarily, or intelligently waives his or her right to testify.  *Id.* at 551–52.  Waiver of the right to testify may be inferred from a defendant's conduct.  Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so.  *See id.* at 551.  Here, Petitioner never alerted the trial court at any time either before or during trial that he wanted to testify.  Indeed, after the prosecution rested, Petitioner testified under oath that he did not wish to testify and wished to exercise his right to remain silent.  (Trial Tr. VII, ECF No. 6-9, PageID.561).  In light of these facts, Petitioner has not and cannot overcome the presumptions that he willingly agreed to counsel's advice not to testify and that his attorney rendered effective assistance of counsel.  *See Gonzales v. Elo*, 233 F.3d 348, 357 (6th Cir. 2000).

## II.    Lesser Included Offense

In his second claim of error, Petitioner contends there was constitutional error when the trial court failed to include an instruction regarding involuntary manslaughter and accident.  The Sixth Circuit Court of Appeals, sitting en banc, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack."  *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc).  The *Bagby* Court held that failure to instruct on lesser-included offenses in a noncapital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure.  *Id.*; *accord Tegeler v. Renico*, 253 F. App'x 521, 524 (6th Cir. 2007); *Todd v. Stegal*, 40 F. App'x 25, 28-29 (6th Cir. 2002); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001); *Samu v. Elo*, 14 F. App'x 477, 479 (6th Cir. 2001); *Williams v.*

- 31 -

*Hofbauer*, 3 F. App'x 456, 458 (6th Cir. 2001).  Shortly after the Sixth Circuit decision in *Bagby*, the Supreme Court emphasized that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983)).  Instead, the only question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 14 (1973)), *cited in Todd*, 40 F. App'x at 29.  Here, there is no miscarriage of justice or fundamental defect in due process.  Furthermore, no clearly established Supreme Court authority requires lesser-included offense instructions in non-capital cases.  Thus, under the AEDPA, 28 U.S.C. § 2254(d)(1), this claim is not a basis for habeas relief.  *Todd*, 40 F. App'x at 28 (citing *Estelle*, 502 U.S. at 71-72)).

## III.    Ineffective Assistance of Appellate Counsel.

In his final claim of error, Petitioner claims his appellate counsel was ineffective for failing to raise ineffective assistance of counsel, failure to instruct on accident, and right to present a defense claims.  The trial court rejected this claim.  (9/30/13 Op. & Order, ECF No. 6-15, PageID.683).  An appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688.  As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong

where the attorney presents one argument on appeal rather than another.  *Smith v. Robbins*, 528 U.S. 259, 289 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present."  *Id.*

Petitioner cannot show prejudice resulting from counsel's alleged failure to raise meritorious issues on direct appeal. Petitioner could have sought leave to file a supplemental brief on direct appeal in which he could include any additional claims of error. Moreover, where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. Feb. 26, 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."); *Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal). The Court has found Petitioner's claims lack merit. Accordingly, the trial court's rejection of Petitioner's contention that his appellate counsel was ineffective is neither inconsistent with nor contrary to clearly established federal law. Petitioner has not established entitlement to habeas relief.

### Certificate of Appealability

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that a certificate of appealability should be denied.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.

Date:  September 13, 2017                              /s/ Ellen S. Carmody
                                                        ELLEN S. CARMODY
                                                        United States Magistrate Judge

- 34 -

**<u>NOTICE TO PARTIES</u>**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)©; FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).